

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

JULIE A. SU, )
ACTING SECRETARY OF LABOR, )
            )
    *Plaintiff*, )
            ) CASE NO. 6:24-CV-00569-LSC
  VS. )
            )  WHD Case No. 1992158
MAR-JAC POULTRY AL, LLC, )
            )
    *Defendant*. )
_____ )

**DEFENDANT'S BRIEF IN OPPOSITION TO
PLAINTIFF'S APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

On May 1, 2024, approximately twenty DOL investigators descended on Mar-Jac Poultry AL, LLC's (hereinafter Mar-Jac) Alabama processing plant to execute a warrant for alleged child labor violations. In a letter of the same date the U.S. Department of Labor's Wage and Hour Division (WHD) advised Mar-Jac it would seek a "hot goods" injunction preventing the shipment in interstate commerce of any goods produced at the plant for 30 days after the alleged child labor violation was committed. (Exhibit B to Declaration of Harvy Michael (Mike) Casto,

hereinafter "Casto Decl.".) WHD's letter requested voluntary compliance by Mar-Jac to refrain from shipping goods in interstate commerce until the matter could be resolved. Mar-Jac offered to stop shipment on the goods produced on that shift. Wage and Hour rejected that offer and demanded Mar-Jac not ship goods in interstate commerce for the next 30 days. Mar-Jac declined to do so voluntarily.

## FACTS

The investigation in the morning identified three (3) minors allegedly employed in violation of the child labor laws. These three employees presented documents showing they were older than 17 years of age. (Casto Decl.at ¶ 5 & 8.) These employees had been cleared through E-verify as over 18 and authorized to work in the United States. (Casto Decl. Exhibit A.) Since the closing conference, which was held on the morning of May 1, 2024, Wage and Hour has claimed to find more alleged minors; however, Wage and Hour has not informed Mar-Jac of the identity of those minors.

The Acting Secretary alleges these minors were engaged in "prohibited, hazardous poultry work." (Dkt. 2-1 at 1.) This reflects a lack of understanding about the poultry processing industry in general and

the jobs that these employees performed in particular. (See Casta Decl. at ¶ 2, 6 & 7) Two of the allegedly underage employees worked in the rehang department, where chilled and eviscerated chicken carcasses are lifted as they come out of the chiller and hung by their legs in shackles for further processing. This activity is not prohibited under Hazardous Order ("HO10"), 29 C.F.R. § 570.61. None of these employees worked on the killing floor and none was engaged in hanging (or killing) live birds. One other employee was alleged to have worked as a wing cutter, using a knife to cut wings from carcasses passing by on a conveyor. This activity is not prohibited under HO10. None of these positions required the use of any powered machinery.

All three employees identified as minors were immediately discharged from employment, promptly ceasing the alleged child labor violation.[1] Contrary to the Acting Secretary's allegation that the employer refused to comply with its demand, Mar-Jac voluntarily sequestered product produced during the shift when the alleged

---

[1] WHD alleges there was a fourth underage employee but has declined to identify the individual or the department he or she is alleged to have worked in, making it impossible for Mar-Jac to end the alleged violation.

violations were discovered and even recalled product that was in transit. WHD was not satisfied with these measures and demanded an immediate 30-day shutdown, to which Mar-Jac could not consent because of the catastrophic impact it would have on its employees, customers and suppliers.

Mar-Jac has informed all employees identified by the Acting Secretary as underage not to work for us until this matter is resolved, thus immediately ending the alleged violation. However, Mar-Jac remains unaware of any minor being employed by Mar-Jac on any shift and has requested that the Acting Secretary disclose any information that any other employee is a minor so that employee can be immediately removed until such time it is determined the individual is a minor or not and employed in violation of the child labor regulations. It has been and continues to be a policy of Mar-Jac that it will hire no one under 18 years of age.

Mar-Jac's Jasper, Alabama facility employs over 1,000 workers (on May 1, 2024, 1,084 employees) and processes approximately 336,000 chickens each day and about 1,680,000 a week. Mar-Jac is the largest employer in Walker County, Alabama. See https://www.wceida.com/largest-

employers. A 30-day "hot goods" injunction would result in approximately1,000 employees being laid off for 30 days, require the destruction of millions of chickens placing them in landfills, the destruction of a million pounds of meat, interrupt the delivery of feed to growers and the delivery of birds for processing, result in all of the chicken house to miss a full cycle and the resulting economic disaster to the farmers, causing seismic economic consequences on the community. (Casto Decl. at ¶12)

The Acting Secretary asserts it procured birth certificates, school, and vaccination records showing that two of the alleged underage employees were 16 years of age and two were 17 years of age. The Acting Secretary fails to acknowledge that each and every one of these employees was cleared by the E-verify system as being more than 18 years of age. The E-verify form requires entry of a birth date. Mar-Jac completed an E-verify check using documents, which process allows it to request on each and every one of the allegedly underage employees and all were determined to be over 18 years of age and eligible to work in the U.S. (Casto Decl. Exh. A)

## SUMMARY OF ARGUMENT

No "hot goods" injunction should be issued, much less a TRO. The Secretary is not likely to succeed on the merits. Although as a matter of policy Mar-Jac does not knowingly employ anyone less than 18 years of age, it does not believe it has violated the child labor regulations because none of the workers identified by the Acting Secretary as minors worked in positions that are not allowed under HO10, 29 C.F.R. § 570.61.

Mar-Jac denies knowledge it had any employees who were less than 18 years of age. Contrary to the Acting Secretary's assertions, Federal child labor laws do not impose strict liability on employers and the Acting Secretary must carry her burden to show that Mar-Jac had knowledge. This she cannot do.

Mar-Jac has done its due diligence. The company has a policy not to hire anyone under 18. Each and every applicant for employment is vetted through the E-verify system, which requires entry of a birthdate. While these alleged minors may have supplied forged documents that misstate their birthdate, the Acting Secretary fails to show that Mar-Jac had knowledge these applicants were underage.

The Acting Secretary cannot show a denial of injunctive relief will cause irreparable harm. As soon as Mar-Jac discovers an employee is a minor, it immediately removes them from the plant. It did so in this case.

In addition, Mar-Jac exercises due diligence: it conducts more detailed examinations if an applicant appears young, while complying with other laws. Since the May 1 inspection, Mar-Jac has redoubled its efforts to identify underage workers who have evaded its efforts to avoid violations. It is interviewing <u>all</u> the employees in the processing plant. If a minor is discovered that employee will be immediately terminated. Mar-Jac has not and will not hire any employee if the documents show the individual is below 18 years of age. However, if the documents the employer is allowed to request under the I-9 rules show the applicant is over 18, and those documents clear the E-Verify system, Mar-Jac may be subject to liability if it rejects that documentation and asks for more. Mar-Jac is exercising all the due diligence the law allows.

Finally, the equities do not support a "hot goods" injunction because of the disproportionate harm plant closure would cause. The Acting Secretary blithely states that a hot-goods injunction will cause only "pecuniary harm" to Mar-Jac's bottom line. This betrays either shocking

naivete or callous indifference to working men and women. Slamming the brakes on a large poultry processing facility for 30 days, throwing more than a thousand employees and others in the production chain out of work and interrupting the flow of perishable products would inflict harm on the community wildly out of proportion to the alleged child labor violations. There would be no money for rent, groceries, or car payments. More than a thousand workers could lose their livelihoods and even homes. Unemployment checks would be too little, too late. Thousands of pounds of chicken and eggs would go to a landfill instead of grocery shelves. And none of this economic chaos would be the least bit effective at stemming oppressive child labor because those violations already have been cured. The Court should deny the requested injunction.

## STANDARD OF REVIEW

Mar-Jac agrees that the Court must consider four factors in determining whether temporary restraining or preliminary injunctive relief is to be granted. These are whether the movant has established: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant;

and (4) that entry of the relief would serve the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005). But Mar-Jac strongly disagrees that the Acting Secretary can pass these tests.

First, the Acting Secretary's case will fail on the merits because all of the allegedly underage employees were over 16 and none was employed in a position prohibited by HO10. Second, no irreparable injury will be suffered if the relief is not granted because the alleged violations already have been cured with the dismissal of the underage workers and Mar-Jac is willing to terminate any minor identified by any reliable source immediately. Third, the harm the relief would inflict on the non-movant, its employees, suppliers, and the community is wildly disproportionate to the threatened injury. And fourth, entry of the relief requested is inimical to the public interest.

## ARGUMENT AND AUTHORITY

### A.     <u>Burden of Proof.</u>

The Secretary bears the burden of proof of a child labor violation, as of any FLSA violation, and must establish knowledge on the part of the employer: this the Acting Secretary has utterly neglected to do in her

brief, apparently taking the position that she doesn't have to. Fifth

Circuit precedent holds otherwise. The Acting Secretary bears the

burden of proving a violation:

> The function of assessing a violation is akin to that of a
> prosecutor or civil plaintiff. If the employer excepts to a
> penalty – as he has a statutory right to do – he is entitled to a
> *de novo* hearing before an administrative law judge. In that
> hearing the assistant regional administrator acts as the
> complaining party and bears the burden of proof on contested
> issues. 29 CFR § 580.21 (a) (1979). Indeed, the Secretary's
> regulations state that the notice of penalty assessment and
> the employer's exception "shall, respectively, be given the
> effect of a complaint and answer thereto for purposes of the
> administrative proceeding." 29 CFR § 580.3 (b) (1979). It is
> the administrative law judge, not the assistant regional
> administrator, who performs the function of adjudicating
> child labor violations. As the District Court found, the
> reimbursement provision of § 16(e) is inapplicable to the
> Office of Administrative Law Judges.

*Marshall v. Jerrico, Inc.*, 446 U.S. 238, 247-48, 100 S. Ct. 1610, 1615-16

(1980).

In *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508 (5th Cir. 1969),[2] the

Fifth Circuit upheld an injunction (but not a "hot goods" injunction)

against an employer enjoining violation of the child labor laws. The court

---

[2] Courts operating within the Eleventh Circuit are bound by decisions
issued by the Fifth Circuit before October 1981. *See Bonner v. City of
Prichard, Alabama*, 661 F.2d 1206, 1207 (11th Cir. 1981).

noted that the Act defines an employee as including "any individual employed by an employer," 29 U.S.C.A. § 203(e) and it recognizes that "employ" is defined as including "to suffer or permit to work." 29 U.S.C.A. § 203(g).The employer maintained that to "suffer or permit" "connotes a consciousness of the employment relationship and a condoning thereof . . . an employer must have actual knowledge that another is working for him in order for that other to be an "employee" under the Act." *Gulf King Shrimp Co.*, 407 F.2d at 512. With that in mind, the Court said, "[W]e need only inquire whether the *circumstances* of the present case were such that the employer either had knowledge that minors were illegally in his employ, or else had "the opportunity through reasonable diligence to acquire knowledge." *Id.* (emphasis in original). This Mar-Jac did, with its policy against hiring workers less than 18 years of age and its use of E-verify to ascertain the eligibility of applicants, including their stated age. The FLSA does not subject an erring employer to strict liability for a child labor violation.

**B.   A "Hot Goods" Injunction is Not an Appropriate Remedy For an Alleged Child Labor Violation.**

FLSA § 15(a)(1) (29 U.S.C. § 215(a)) makes it "unlawful for any person … to transport, offer for transportation, ship, deliver, or sell in

commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of" the FLSA's minimum wage or overtime provisions or associated regulations, with certain exceptions not at issue here.

The hot goods provision is intended "to both prevent goods from being produced with labor that does not meet minimum standards and to 'eliminate the competitive advantage enjoyed by goods produced under substandard conditions.'" *Citicorp Indus. Credit Corp. v. Brock*, 483 U.S. 27, 36, 107 S. Ct. 2694 (1987). If movement of the "hot goods" is not restrained, law-abiding enterprises will suffer from unfair competition, Defendants will be unjustly enriched, and the employees who mined and produced the "hot goods" will be disadvantaged by substandard labor conditions.

"Hot goods" injunctions typically are imposed only when an employer fails to pay its employees, in violation of the FLSA:

> The Secretary of Labor normally only seeks temporary restraining orders and subsequent injunctions against employers who have missed a payroll. While any employer who ships goods produced in violation of the minimum wage and overtime provisions of the Act in any manner violates the hot goods provision, the Secretary does not routinely seek

injunctions for such violations. In most cases where the employer is a going concern and is able to remedy its past violations, the Secretary of Labor will order the employer to give backpay and the employer complies. However, where the employer is unable to correct and make restitution for its past violations, the Secretary will seek an injunction until the employer can properly pay its employees the money owed to them.

2 Wage and Hour Law: Compliance and Practice ("WHLCP") § 13:2.

(Copy attached.)

The only reported case where USDOL sought a hot goods injunction for a child labor violation appears to be *Mitchell v. Hertzke*, 234 F.2d 183, 185 (10th Cir. 1956). In that case the Hertzkes and Rodriguez were found to be employers who violated the child labor provisions on two occasions; and they did not contest that finding in court. The court found that both Section 12(a), the so-called 'hot goods' embargo on manufacturers, and the 12(c) prohibition against employers, together made employers responsible to insure against the use of unlawful child labor.

The question before the Court of Appeals was whether the facts or law in this case required the lower court to issue the requested injunctions. The Court began with the observation that

> [a]long with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. *Hecht Co. v. Bowles, supra; Goshen Mfg. Co. v.*

*Hubert A. Myers Mfg. Co.*, 1916, 242 U.S. 202, 37 S.Ct. 105, 61 L. Ed. 248. The purpose of an injunction is to prevent future violations, *Swift & Co. v. United States*, 1928, 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L. Ed. 587, and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. **The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive**. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the *bona fides* of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations. (Emphasis supplied.)

*Mitchell v. Hertzke*, 234 F.2d 183, 187.

In *Hertzke* the trial court denied the injunction, having concluded there was no reason to believe future violations would occur. It found that Kuner-Empson had been diligent and made unusual efforts to educate the growers against the use of child labor; that the proven violations by any of the parties were few; and there was no reason to believe future violations would occur.

The Court of Appeals noted it was not the trier of the facts, and whether as the trier of the facts it might have reached a contrary conclusion was not determinative of the questions presented on appeal. "We inquire only to ascertain whether there was an abuse of discretion.

That question can be answered only from a consideration of the record." *Hertzke*, 234 F.2d at 187.

Here, there is no current violation: the employees the Acting Secretary identified as underage all have been discharged. No injunction is required to ensure discontinuance. Mar-Jac has exercised due diligence, using E-verify, and has agreed to undertake additional steps to ensure that no more are hired, and if any found, fired. If "[t]he purpose of an injunction is to prevent future violations," see *Swift & Co.*, 276 U.S. at 326, 48 S.Ct. at 314, a "hot goods" injunction would serve no purpose.

## C.  <u>The Acting Secretary Is Not Entitled to A Presumption of Irreparable Injury.</u>

The Acting Secretary claims she is entitled to a presumption of irreparable injury, citing *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984), but the Court so held in the context of race discrimination and fair housing, not child labor. In this context irreparable harm cannot be assumed from the mere fact of an alleged violation, particularly where, as here, the violation ceased with the discharge of employment of the alleged minors and the employer had acted with due diligence to avoid child labor violations by adopting a policy of hiring no one less than 18 years of age and using E-verify, the

U.S. Government's own program, to check that employment would be legal. A presumption of irreparable injury short-circuits due process, putting the Acting Secretary in a heads-I-win, tails-you-lose position that is not compatible with the 4-factor test for issuance of an injunction. Rather, the Acting Secretary must show that the Court's failure to issue an injunction will cause irreparable harm, which she cannot do because the violation already has ceased. The presence of three or four undetected minors in a workforce of over 1000 hardly presents a competitive advantage to Mar-Jac, or grounds to compel "disgorgement" of ill-gotten profits. The Acting Secretary certainly presents no calculations to support her claims. In contrast, Mar-Jac estimates that a 30-day shutdown could likely cause approximately $63,000,000 of economic damage not just to Mar-Jac, but to its employees ($3,500,000), contractors, breeders, hatcheries, and feed mills, to name but a few of the potential casualties. (See Casto Decl. at ¶ 12.)

The vast majority of the "hot goods" cases, including those the Assistant Secretary cites, concerned violations of the FLSA's minimum wage and overtime provisions, not child labor. See, e.g., *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 306, 105 S. Ct. 1953, 1964,

85 L.Ed.2d 278, 291 (1985); *Brock v. Ely Grp., Inc.*, 788 F.2d 1200, 1205 (6th Cir. 1986). Indeed, there appears to be only one unofficially reported case – *Acosta v. Paragon Contractors Corp.*, No. 2:06-cv-700-TC, 2019 U.S. Dist. LEXIS 234114 at 26, n.14 (D. Utah July 2, 2019) -- where the "hot goods" provision was used to seize the proceeds of a pecan harvest from an unscrupulous polygamous group that employed over 100 children, for multiple years, without pay or any records whatsoever.

**D.**     **The Acting Secretary Is Unlikely to Have Success on the Merits Because the Rehang and Wing Cutter Positions are Not Prohibited Under HO10.**

The Acting Secretary identified three alleged minor employees who were employed at the plant. Two worked in rehang, removing chilled carcasses coming out of the chiller and placing them in shackles for further processing. One worked as a wing cutter, using a knife to cut wings from carcasses as they passed along a conveyor. Neither of these positions require the use of any powered equipment and thus are not covered by HO10, which lists jobs that are prohibited to minors. Accordingly, the Secretary's request for an injunction should be denied because there is little likelihood of success on the merits.

29 C.F.R. § 570.61, ("HO10"), lists with specificity occupations requiring the operation of power-driven meat-processing machines and occupations involving slaughtering, meat and poultry packing, processing, or rendering that children between 16 and 18 years of age are not allowed to perform, as follows:

(a) ***Findings and declaration of fact.*** The following occupations in or about slaughtering and meat packing establishments, rendering plants, or wholesale, retail or service establishments are particularly hazardous for the employment of minors between 16 and 18 years of age or detrimental to their health or well-being:

(1) All occupations on the killing floor, in curing cellars, and in hide cellars, except the work of messengers, runners, handtruckers, and similar occupations which require entering such workrooms or workplaces infrequently and for short periods of time.

(2) All occupations involved in the recovery of lard and oils, except packaging and shipping of such products and the operation of lard-roll machines.

(3) All occupations involved in tankage or rendering of dead animals, animal offal, animal fats, scrap meats, blood, and bones into stock feeds, tallow, inedible greases, fertilizer ingredients, and similar products.

(4) All occupations involved in the operation or feeding of the following power-driven machines, including setting-up, adjusting, repairing, or oiling such machines or the cleaning of such machines or the individual parts or attachments of such machines, regardless of the product being processed by these machines (including, for example, the slicing in a retail delicatessen of meat, poultry, seafood, bread, vegetables, or

18

cheese, etc.): meat patty forming machines, meat and bone cutting saws, poultry scissors or shears; meat slicers, knives (except bacon-slicing machines), headsplitters, and guillotine cutters; snoutpullers and jawpullers; skinning machines; horizontal rotary washing machines; casing-cleaning machines such as crushing, stripping, and finishing machines; grinding, mixing, chopping, and hashing machines; and presses (except belly-rolling machines). *Except,* the provisions of this subsection shall not apply to the operation of those lightweight, small capacity, portable, countertop mixers discussed in § 570.62(b)(1) of this chapter when used as a mixer to process materials other than meat or poultry.

(5) All boning occupations.

(6) All occupations that involve the pushing or dropping of any suspended carcass, half carcass, or quarter carcass.

(7) All occupations involving the handlifting or handcarrying any carcass or half carcass of beef, pork, horse, deer, or buffalo, or any quarter carcass of beef, horse, or buffalo.

(b) ***Definitions.*** As used in this section:

*Boning occupations* means the removal of bones from meat cuts. It does not include work that involves cutting, scraping, or trimming meat from cuts containing bones.

*Curing cellar* includes a workroom or workplace which is primarily devoted to the preservation and flavoring of meat, including poultry, by curing materials. It does not include a workroom or workplace solely where meats are smoked.

*Hide cellar* includes a workroom or workplace where hides are graded, trimmed, salted, and otherwise cured.

*Killing floor* includes a workroom, workplace where such animals as cattle, calves, hogs, poultry, sheep, lambs, goats,

buffalo, deer, or horses are immobilized, shackled, or killed, and the carcasses are dressed prior to chilling.

*Retail/wholesale or service establishments* include establishments where meat or meat products, including poultry, are processed or handled, such as butcher shops, grocery stores, restaurants and quick service food establishments, hotels, delicatessens, and meat locker (freezer-locker) companies, and establishments where any food product is prepared or processed for serving to customers using machines prohibited by paragraph (a) of this section.

*Rendering plants* means establishments engaged in the conversion of dead animals, animal offal, animal fats, scrap meats, blood, and bones into stock feeds, tallow, inedible greases, fertilizer ingredients, and similar products.

*Slaughtering and meat packing establishments* means places in or about which such animals as cattle, calves, hogs, poultry, sheep, lambs, goats, buffalo, deer, or horses are killed, butchered, or processed. The term also includes establishments which manufacture or process meat or poultry products, including sausage or sausage casings from such animals.

(c) **Exemptions.** This section shall not apply to:

(1) The killing and processing of rabbits or small game in areas physically separated from the killing floor.

(2) The employment of apprentices or student-learners under the conditions prescribed in § 570.50(b) and (c).

The occupations the alleged minors identified by the Acting Secretary in its investigation of Mar-Jac's Alabama facility, are not included in this list. Specifically, there is no prohibition that would apply

to the rehang operation described above. Rehanging chicken carcasses that have been eviscerated, inspected, de-feathered, beheaded, de-pawed, and chilled is far removed from live hang and the killing floor. In fact, employees who work on the "live side," where birds are slaughtered, are strictly prohibited even from entering the "cold side," where the operations have more in common with a large commercial kitchen.

As to the employee who trimmed wings in the debone department, the definition plainly excludes that occupation: "(b) *Definitions.* As used in this section: *Boning occupations* means the removal of bones from meat cuts. It does not include work that involves cutting, scraping, or trimming meat from cuts containing bones." The wing trimmer cuts, trims, or removes wings from chicken carcasses. They do not "remove bones from meat," but only cut one small part off the chicken. That activity – "trimming meat from cuts containing bones" -- is explicitly excluded from the HO10 prohibition by its plain language.

The Acting Secretary's insistence that these jobs are prohibited by HO10 betrays the investigators' ignorance of poultry operations. Rehang does not take place on the killing floor, and separating a wing from a

chicken carcass does not fall within the plain meaning of "boning operations."

## E.   The Harm a 30-Day Shutdown Would Cause Far Outweighs Any Good.

The purpose of a preliminary injunction or a TRO is to preserve the status quo until the court issues a decision on the merits of the action. *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 (11th Cir. 1999). Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a TRO must establish that: (1) there is a substantial likelihood of success on the merits; (2) irreparable injury will be suffered if relief is not granted, that is, there is no adequate remedy at law; (3) the threatened injury outweighs any harm that relief would inflict on the non-movant; and (4) the entry of the requested relief would serve the public interest. *Siebert v. Allen*, 506 F.3d 1047, 1049 (11th Cir. 2007) (*per curiam*) (citation omitted); *Schiavo*, 403 F.3d at 1225-26 (citations omitted). The same factors are considered in deciding whether to grant either a TRO or a preliminary injunction. *Schiavo*, 403 F.3d at 1225.

The Eleventh Circuit has held that "a preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries [his] burden of persuasion on each of these

prerequisites." *SunTrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001) (*per curiam*) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). The decision to grant or deny a preliminary injunction "'is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion.'" *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002)). "We do not say or imply that injunctions should be issued freely, without regard for the facts, simply because it is the Government asking for the injunction." *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962).

Applying these factors, this Court should deny the Secretary's request for a "hot goods" injunction. First, there is not a substantial likelihood of success on the merits because, as set forth above, based on the plain language of HO10 it is unlikely there was a child labor violation with respect to the two rehang employees or the wing trimmer. Further, the Secretary is not able to show that Mar-Jac suffered or permitted the alleged violations. Second, irreparable injury will not be suffered if relief is not granted: the alleged violation has been conclusively abated. There

is an adequate remedy at law, in the form of civil money penalties should the Secretary so choose. Third, the threatened injury does not outweigh any harm that relief would inflict on the non-movant. There is no threatened injury anymore now that the alleged minors have been discharged and Mar-Jac has pledged enhanced measures to ensure that no others are inadvertently hired. And fourth, the entry of the requested relief would not serve, but have severe adverse impact, on the public interest since it would result in the paralysis of a major employer, the layoff or furlough of a thousand employees, and a major disruption in the supply chain of important and perishable foodstuffs.

## CONCLUSION

If the District Court grants a TRO prohibiting the transportation of tens of millions of pounds of chicken products and throwing a thousand workers out off their jobs based on the discovery of three alleged child labor violations already conclusively abated, it will be boldly going where no court has gone before. Although technically USDOL has the power to seek a "hot goods" TRO for any FLSA violation – which is broad indeed – in this case the legal requirements for issuing a TRO are not met because there is risk of irreparable harm: there is no evidence of widespread child

labor violations or indication that further violations are imminent. The Secretary does not appear to have sought a "hot goods" TRO in the far more egregious *Paragon* case where there were over 100 child labor violations. Nor would it be in the public interest to paralyze a poultry processing plant because of three alleged child labor violations that have been "cured" with the discharge of the underage employees. No harm would be remediated, only community-wide punishment inflicted. For these reasons the Secretary's application should be denied.

Respectfully submitted this 8th day of May 2024.

Respectfully submitted,

/s/ T. Kelly May
T. Kelly May, Esq.
Alabama Bar No. asb-6090-y57t
CLARK, MAY, PRICE, LAWLEY, DUNCAN
 & PAUL LLC
3070 Green Valley Road
Birmingham, AL 35243
(205) 267-6601
kmay@clarkmayprice.com
*Local Counsel for Defendant*

J. Larry Stine
WIMBERLY, LAWSON, STECKEL,
 SCHNEIDER & STINE, P.C.
Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 365-0900
jls@wimlaw.com
*Admitted Pro Hac Vice*
**Attorneys for Defendant**

## CERTIFICATE OF SERVICE

I hereby certify that I have this **8th** day of **May, 2024** electronically filed the foregoing with the Clerk of Court using the CM/ECF system and by placing a copy of same in the United States Mail, postage paid to the following:

***Attorneys for the Acting Secretary of Labor, United States***

John O. Gainey
JOHN O. GAINEY
Trial Attorney

SEEMA NANDA, Solicitor of Labor
TREMELLE I. HOWARD, Regional Solicitor
KRISTIN MURPHY, Acting Counsel
Department of Labor
Office of the Solicitor
U.S. Department of Labor
61 Forsyth Street, S.W., Room 7T10
Atlanta, GA 30303
(678) 237-0623
(404) 302-5438 (Facsimile)
Murphy.kristin.r@dol.gov
gainey.john.o@dol.gov
atl.fedcourt@dol.gov

*/s/ T. Kelly May*
OF COUNSEL

## 2 Wage and Hour Law § 13:2

**Wage and Hour Law: Compliance and Practice**   April 2024 Update
Les A. Schneider, J.D. and J. Larry Stine, J.D.

**I. Fair Labor Standards Act**

**Chapter 13. Hot Goods**

## § 13:2. Failure to pay minimum wage and overtime or comply with certification requirements

An employer violates the hot goods prohibition by failing to pay minimum wage or overtime or failing to comply with wage certification and child labor requirements. An employer avoids the hot goods prohibition only when it complies with Section 6 (minimum wages), Section 7 (maximum hours), Section 12 (child labor) and Section 14 (wage certification) of the Act.[1] The Secretary of Labor normally only seeks temporary restraining orders and subsequent injunctions against employers who have missed a payroll. This effectively shuts down the employer's business until the payroll is met. While any employer who ships goods produced in violation of the minimum wage and overtime provisions of the Act in any manner violates the hot goods provision, the Secretary does not routinely seek injunctions for such violations. In most cases where the employer is a going concern and is able to remedy its past violations, the Secretary of Labor will order the employer to give backpay and the employer complies. However, where the employer is unable to correct and make restitution for its past violations, the Secretary will seek an injunction until the employer can properly pay its employees the money owed to them.

Furthermore, the regulations provide that an employer may be enjoined from shipping hot goods if the employer is in violation of any regulation or order of the Administrator issued under Section 14 of the Act—the special wage certification for students, learners and disabled employees and the child labor provision.[2]

> **Helpful Hints:**
> An employer has hot goods if he or she violates Section 6 (minimum wages) or Section 7 (maximum hours) of the Act or violates any regulation or order of the Administrator issued under Section 12 (child labor) or Section 14 (certification requirements) of the Act.

Westlaw. © 2024 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

[1]   29 U.S.C.A. § 215; 29 C.F.R. § 789.1.

[2]   29 U.S.C.A. §§ 212(a), 214; 29 C.F.R. § 789.1.

§ 13:2. Failure to pay minimum wage and overtime or..., 2 Wage and Hour Law...

**End of Document**                                            © 2024 Thomson Reuters. No claim to original U.S. Government Works.