FILED
2024 May-14  PM 12:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| JULIE A. SU, | ) | |
| Acting Secretary of Labor, | ) | CIVIL ACTION NO. |
| United States Department of Labor, | ) | |
| | ) | 6:24-cv-00569-LSC |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MAR-JAC POULTRY OF ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S BRIEF IN OPPOSITION TO
PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

Defendant's Brief in Opposition to Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction ("Defendant's Response") is a misguided attempt to persuade this Court to allow Defendant to flout the inherent dangers of oppressive child labor and its obligations under the Fair Labor Standards Act ("FLSA" or "Act"). 29 U.S.C. § 212(a), (c). Defendant's Response (1) attempts to shirk its obligation to employ reasonable diligence to ascertain whether it had minors working in its poultry plant and incorrectly mischaracterizes *Gulf Shrimp* as requiring actual knowledge of its child workers; (2) fails to acknowledge 29 U.S.C. § 212(a), the statutory provision authorizing the Acting Secretary of Labor, (the "Acting Secretary") to seek a court order to prevent the interstate shipment of goods that were produced in violation of the child labor provisions of the FLSA (referred to as "hot goods"); and (3) unconvincingly argues that the minors working in its facilities were working in non-hazardous occupations. Moreover, the Acting Secretary's request for relief has become only more urgent

because Defendant continues to ship hot goods while the verified number of minor children working at Defendant's facility on May 1, 2024 continues to grow to six minor children employed in violation of the Act.   Nothing in Defendant's Response persuasively counters the Acting Secretary's arguments that injunctive relief is warranted in this case.   Because Defendant employed oppressive child labor in or about its facility in the past 30 days and is shipping goods produced in that facility notwithstanding the prohibition from doing so in section 12(a) of the FLSA., the Court should grant the Acting Secretary's Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion").

**I.      The Acting Secretary Has Established a Likelihood of Success on the Merits Because Defendant Mar Jac Employed Oppressive Child Labor in Violation of the FLSA.**

In its opposition to the Acting Secretary's Motion, Defendant proffers a number of arguments as to why the Acting Secretary is unlikely to succeed on the merits of this child labor case, including (1) that Defendant did not "employ" children in violation of the Act because it did not know that it was employing minors and (2) because the children's employment was not prohibited by the Act.   As demonstrated below, both allegations are without merit.   Mar Jac, an employer with a history of child labor violations at its poultry processing facilities, was particularly positioned to identify instances where it was employing children at its facilities. Moreover, the children employed at the plants in question were unquestionably employed in violation of Hazardous Occupations Order No. 10, 29 C.F.R. 570.61, when they were employed in an inherently hazardous area of the plant, the kill floor, and performed hazardous work when

2

they deboned chicken.  The Secretary has therefore demonstrated that she is likely to succeed on the merits of her claim that Mar Jac employed oppressive child labor.

A.   <u>The Acting Secretary Can Establish that Defendant Employed Oppressive Child Labor at its Jasper Alabama Poultry Processing Plant Because It Suffered or Permitted the Children to Perform Hazardous Work.</u>

Defendant argues, *see* Doc. 6 at 6, 9-11, that the Acting Secretary has not shown that the employer knowingly employed children at its plant.  As explained below, however, the Acting Secretary can easily demonstrate that Defendant "employed" children at its plant in violation of the Act's child labor provisions within the expansive meaning of that statutory definition because Defendant knew and had the opportunity to ascertain through the exercise of reasonable diligence that it was employing children at its facility in violation of the Act.

1.   The first relevant question here is whether Defendant employed, or "suffered or permitted", the children's work.  *See* 29 U.S.C. 203(g) (defining "employ" as "includ[ing] to suffer or permit to work").  Prior to the FLSA's enactment, the phrase "suffer or permit" (or some version of the phrase) was commonly used in state child labor laws, and the "suffer or permit" standard was used to determine liability for violations of those laws.  The standard was designed to expand child labor laws' coverage and render moot an employer's argument that it was unaware that children were working, thus imposing upon a proprietor a nondelegable responsibility with respect not only to children directly employed by him but also to children whom he suffered or permitted to work in his business.  *See, e.g., Antenor v. D & S Farms*, 88 F.3d 925, 929 n.5 (11th Cir. 1996) ("The 'suffer or permit to work' standard derives from state child-labor laws designed to reach businesses that used middlemen to illegally hire and supervise children.").

3

2.  Drawing upon the Act's expansive definition of what it means to "employ" oppressive child labor, courts have imposed an exacting standard under which an employer will be judged for its child labor violations.  The Sixth Circuit, for example, has concluded that "an employer's responsibility for child labor violations approaches strict liability, and an employer cannot avoid liability by arguing that its supervisory personnel were not aware of the violation, or by simply adopting a policy against employing children in violation of the Act." *Martin v. Funtime, Inc.*, 963 F.2d 110, 115 (6th Cir. 1992).  The Eighth Circuit has similarly opined that "corporations must be held strictly accountable for the child labor violations of subordinates[,]" and that a company's obligation to ensure that it is not employing oppressive child labor "does not end with mere directive communication to . . . subordinates." *Lenroot v. Interstate Bakeries Corp.*, 146 F.2d 325, 328 (8th Cir. 1945)).

In *Gulf King Shrimp Co. v. Wirtz*, the Fifth Circuit articulated the relevant standard as whether the employer either knew or "had the opportunity through reasonable diligence to acquire knowledge" of child labor, stating that "an employer's knowledge is measured in accordance with his "duty . . . to inquire into the conditions prevailing in his business."  407 F.2d 508, 512 (5th Cir. 1969) (citing *Lenroot v. Interstate Bakeries Corp.*, 146 F.2d 325, 328 (8th Cir. 1945) (internal quotations omitted)).  Observing that "[t]he cases must be rare where prohibited work can be done within the plant, and knowledge or the consequences of knowledge avoided[,]" the court stated that "[w]hile we do not expect geiger counters or the like to determine the presence of child laborers, neither do we find that passive acceptance of their work is permissible."  *Id.* at 512,514 (internal citations omitted).  The court thus concluded that in the

4

instant case, it did "not believe that the underaged who worked for Gulf King were intrepid trespassers beyond the control and visual detection of company representatives." *Id.* at 513.

3. Defendant had the opportunity to learn of the oppressive child labor employed at its facility through the exercise of reasonable diligence. Defendant argues in its Response that it did "not knowingly employ anyone less than 18 years of age" and that its "policy against hiring workers less than 18 years of age and its use of E-verify" absolve it of liability for hiring minor workers. *See* Doc. 6 at 6. The authority cited above clearly demonstrates that these efforts were insufficient to meet Defendant's obligation to exercise reasonable diligence to ensure that it was not employing oppressive child labor, particularly where, in this case, Defendant has a lengthy history of *very recent* child labor violations in its poultry processing facilities.

Firstly, Defendant's assertion that it can use a reliance on E-Verify as a shield against section 12 violations of the FLSA is misplaced. E-Verify "is an internet-based system that allows an employer to verify an employee's work-authorization status." *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 862 (9th Cir. 2009). the E-verify system is not intended to verify an individual's age. Rather, the system is intended to determine whether the individual is lawfully eligible to perform work in the United States as a general matter. See generally What is E-Verify. An employer submits a request to the E-Verify system based on information the employee provides, similar to that used in the I-9 process. This process requires employees to attest to their eligibility to work and to present one of the specified identity documents. 8 U.S.C. § 1324a(b)(1-2). It then requires employers to examine the identity document the employee presents and attest that it appears to be genuine. 8 U.S.C. § 1324a(b)(6). E-Verify is not

designed to verify the age of employees, only whether they are authorized to work in the United States.  As evidenced in this case, Defendant's use of E-Verify did not prevent the employment of numerous minors at multiple facilities.  This is one of the many reasons that Wage and Hour policy prohibits the reliance on I-9 forms to verify a minor's age. Secondly, exercising reasonable diligence to ensure compliance with the child labor laws requires more than a paperwork check.  As amply illustrated in the courts of appeals cases cited above, an employer's responsibility to exercise reasonable diligence to ensure that it is not employing oppressive child labor is a continuously active, not a one-time or passive, exercise.  *See Gulf King Shrimp*, 407 F.2d at 513 (minor workers could have been "visual[ly] detect[ed]" by management).  In *Gulf King Shrimp*, the court concluded that the employer had the opportunity to acquire knowledge of the minors because the supervisor should have known about the minors working in the facility. 407 F.2d at 513 (concluding that "[g]iven the nature of his duties and the fact that he was alerted to the principal subterfuge by which minors were able to work, [the supervisor's] alleged ignorance and lack of opportunity to acquire knowledge are not entirely credible.").  There are many different ways that an employer can and should affirmatively ensure that it is not employing oppressive child labor, including visual detection, training supervisors on the obligation to not employ minors in hazardous work and implementing a system whereby coworkers can report suspected child labor.

Finally, the exercise of reasonable diligence in this case should have been informed by Defendant's recent discovery of extensive child labor at another poultry processing facility.[1] Despite Defendant's history of employing minor workers at its poultry plant facilities, Defendant fails to acknowledge the circumstances surrounding its rampant employment of minor children that should have incentivized Defendant to implement rigorous screening of its employees and its worksites to ensure it was not employing oppressive child labor.

      B.    <u>The 16- and 17-Year-Old Children Working at Defendant's Facility were Employed in Oppressive Child Labor Because they were Employed in Violation of Hazardous Occupation No. 10, 29 C.F.R. § 570.61.</u>

In nonagricultural employment, the FLSA prohibits 16- and 17-year-olds from being employed to perform any work that has been determined to be hazardous by the Acting Secretary of Labor. *See* 29 U.S.C. 203(l), 212(c).  In this case, after conducting an in-person investigation based on its warrant execution, the Wage and Hour Division ("WHD") identified a number of 16- and 17-year-old children working in violation of Hazardous Occupation Order No. 10 ("HO 10"), which prohibits children of that age from performing most work in poultry processing facilities. 29 C.F.R. § 570.61.

---

[1] Less than a year ago, a 16-year-old child died after being caught and pulled into a cleaning machine in the deboning facility of the Mar-Jac Poultry plan in Hattiesburg, Mississippi. *See Death of 16-Year-Old at Mississippi Poultry Plant Prompts Federal Investigation*, N.Y. TIMES, https://www.nytimes.com/2023/07/19/us/mississippi-poultry-plant-death.html (last visited May 10, 2024); *U.S. Faults Mississippi Poultry Plant in Death of 16-Year-Old*, N.Y. TIMES, https://www.nytimes.com/2024/01/16/business/mississippi-marjac-poultry-teen-death.html (last visited May 10, 2024).

As relevant here, HO 10 prohibits 16- and 17-year-olds from performing "[a]ll occupations on the killing floor" and "all boning occupations."  29 C.F.R. 570.61(a)(1), (5).  "*Killing floor*" is defined as "a workroom or workplace where . . . poultry . . . [is] immobilized, shackled, or killed, and the carcasses are dressed prior to chilling."  *Id.* at 570.61(b).  "*Boning occupations*" are defined as "the removal of bones from meat cuts.  It does not include work that involves cutting, scraping, or trimming meat from cuts containing bones."  *Id.*

After executing a warrant and conducting an investigation of Defendant's Jasper facility, WHD concluded that Defendant was employing at least six minor children in violation of HO 10 because they were employed on the killing floor, employed in boning occupations, or both.  Defendants argue (Doc. 6 at 17-21) that the Secretary will not be able to establish that these minors' employment fell within the scope of that hazardous order because, *e.g.*, they were not employed on a "killing floor" or to perform a boning occupation within the scope of that Order.  However, the evidence does plainly establish the existence of these violations.

1.  The Killing Floor

As noted above, HO 10 prohibits all work on the killing floor, defined as including "a workroom, workplace where such animals as cattle, calves, hogs, poultry, sheep, lambs, goats, buffalo, deer, or horses are immobilized, shackled, or killed, and the carcasses are dressed prior to chilling." 29 CFR 570.61(b).  Thus, the definition of a "killing floor" is a functional definition that does not include only the actual "killing" of the animal.  "Dressed" is not defined in the regulations or FOH, but the United States Department of Agriculture ("USDA") defines "dressed poultry" as "slaughtered, defeathered, eviscerated whole birds with the head and feet removed,

i.e., a ready-to-cook whole bird."[2] "Eviscerate" is similarly not defined, but Merriam-Webster defines it as "to take out the entrails of; disembowel."[3] In the present case, therefore, by the time the chicken leaves the "killing floor" it has been slaughtered, defeathered, be-headed, and disemboweled (eviscerated).  *See* Wage and Hour Field Operations Handbook ("FOH") 33h10(b)(2)(a) (listing occupations that are customarily performed on killing floors).

All of this work – slaughtering, dressing, and eviscerating -- happens on the killing floor, and while HO 10 contemplates that the killing floor "ends" once the carcasses are "chilled" in "coolers" this cooling process, as described in HO 10, is to be distinguished from the "chiller" referenced in Defendant's brief.  *See* FOH 33h10(a)(6)d. ("The term 'killing floor' includes a workroom or workplace where such animals as cattle, calves, hogs, poultry, sheep, lambs, goats, buffalo, deer, or horses are immobilized, shackled, or killed, and the carcasses are dressed prior to chilling.  The killing floor does not include coolers.").  Defendant's reference to "chillers" (Doc. 6 at 17) refers to machines that quickly cool the chicken in water to curb bacterial growth.[4] These "chillers," used to quickly reduce the bird's temperature after the feathers are removed, are distinguishable from the "coolers" referenced in the HO Report (1952), which was the basis for original HO 10.  By way of background, in the 1950s when HO 10 was both contemplated and

---

[2] https://www.fsis.usda.gov/sites/default/files/import/Labeling_Guide_on_Poultry_Food_Dating.pdf at pg. 2.

[3] https://www.merriam-webster.com/dictionary/eviscerate

[4] https://www.poultryprocessingequipment.com/pre-chill_equipment/screw_chiller.asp#:~:text=The%20Screw%20Chiller%20%2F%20Spin%20Chiller,tub%2C%20filled%20with%20chilled%20water

promulgated, it only applied to the processing of larger animals.  17 Fed. Reg. 3034 (Apr. 8, 1952) (defining "killing floor" as a workplace where animals such as "cattle, calves, hogs, sheep, lambs, goats, and horses" are killed and dressed "prior to chilling").  **Poultry was not added to the scope of HO 10 until 2010 and thus the HO 10 Report does not specifically contemplate poultry slaughtering and processing.**  *See* 75 FR 28435.  The HO 10 Report explains that "work on the killing floor involves killing the animal, draining the blood from the carcass, removing the hide or hair, removing the head and entrails, dividing the carcass into halves, and sending the carcass halves to the cooler." HO 10 Report at 8. **The carcasses are sent to coolers *and held for several hours* where the meat is chilled and ultimately sent to the "cutting department."**  HO 10 Report at 10.  Therefore, the "chilling" process referred to in the regulation refers to the animal carcasses being sent to a cooler for several hours after extensive processing and does not refer to the quick-chill process implemented here in the poultry processing facility where the chickens are continuously moving through the "chiller" and down the line.  As a result, the "chilling" process used in Defendant's poultry processing does not indicate the end of the "killing floor" as contemplated in the Department's regulations, and instead continues past the point that the chickens enter the "chiller." Thus, the children employed in the slaughtering, dressing, and eviscerating processes, were illegally employed on the killing floor in violation of HO 10.

    2. <u>Boning Occupations</u>

As noted above, HO 10 defines "Boning occupations" as "the removal of bones from meat cuts. It does not include work that involves cutting, scraping, or trimming meat from cuts containing bones." 29 CFR 570.61(b).  The FOH defines a "cutting department" as the "place

where carcasses are portioned, boned, and trimmed." FOH 33h10(b)(2)d.  As explained below,

Defendant illegally employed several children in boning occupations within the scope of this

regulation.

Here, Defendant has established in its initial pleadings that it employed one of the minors

identified by WH oppressive child labor by including its own personnel records. *See* Doc. 6-2 at

6. By their own records, Defendant employs one of the minor children identified on May 1, 2024

with a job profile of "Debone Cone Lines Night – Hourly." *Id.* This job is covered squarely by

HO 10, which prohibits 16- and 17-year-olds from engaging in "all boning occupations." 29 CFR

570.61(a)(5).

II.     **The FLSA specifically authorizes the Acting Secretary of Labor to seek a
        court  order to prevent the interstate shipment of goods that were produced
        in violation of the child labor provisions of the FLSA and the Acting
        Secretary regularly utilizes that authority in appropriate cases, including in
        this action, where goods were produced in a facility that employed oppressive
        child labor.**

The Defendant argues (Doc 6 at 11-15) that a hot goods injunction seeking to enjoin the

interstate shipment of goods that were produced in violation of the FLSA's child labor provisions

is not an appropriate remedy in this case, in part because it does not believe that the Department

routinely seeks hot goods injunctions in child labor cases.

As an initial matter, the FLSA specifically contemplates and authorizes precisely this sort

of action.  Section 12(a) of the Act, 29 U.S.C. 212(a), prohibits a producer, such as Defendant,

from shipping goods that were produced in an establishment in or about which within 30 days

11

prior to the removal of the goods, oppressive child labor was employed.[5] Section 17 of the Act, 29 U.S.C. 217, authorizes this court to restrain violations of section 215 of the Act.  Section 215(a)(4), in turn, lists as a prohibited act "any of the provisions of section 212 of this title," which includes the child labor hot goods provision prohibiting the shipment of hot goods (sec. 212(a)) as well as the prohibition against employing oppressive child labor (sec. 212(c)).  There is therefore no question that the Acting Secretary is statutorily permitted to request injunctive relief to restrain the shipment of goods tainted by the employment of oppressive child labor in this court.

Secondly, there is ample evidence that the Acting Secretary does routinely exercise her authority to seek injunctive relief under sections 12(a) of the Act in appropriate child labor enforcement cases.  Examples of recent cases in which the Department has sought to enjoin the movement of goods pursuant to section 12(a) include the following: *Su v. L & Y Food, Inc.*, 2024 WL 1632954 (C.D. Cal. 2024); *Su v. Exclusive Poultry*, 2023 WL 8152006 (C.D. Cal. 2023); *Su v. Florence Hardwoods, LLC*, No. 1:23-cv-01167 (E.D. Wis. 2023); *Su v. Monogram Food Solutions, et. al.*, No. 23-cv-2007 (D. Minn. 2023); and *Walsh v. SL Alabama, LLC*, No. 22-cv-00507-CWB (E.D. Ala. 2022).  Examples of historic enforcement actions seeking to enjoin the shipment of hot goods under section 12(a) of the Act include *Western Union Telegraph Co. v. Lenroot*, 323 U.S. 490 (1945), *Lenroot v. Kemp* and *Lenroot v. Hazlehurst Mercantile Co.*, 153 F.2d 153 (5th Cir. 1946); *Lenroot v. Interstate Bakeries Corp.*, 146 F.2d 325 (8th Cir. 1945);

---

[5] In its opposition, Defendant erroneously cites 29 U.S.C. 215(a)(1), a *different* provision that prohibits the shipment of hot goods produced in violations of the Act's minimum wage and overtime requirements.

*Tobin v. Grant*, 79 F. Supp. 975 (N.D. Cal. 1948), *Solis v. Laurelbrook Sanitarium & School, In*c.*,* 642 F.3d 518 (6th Cir. 2011); *McLaughlin v. McGee Bros. Co.* and *McLaughlin v. Wendell's Work, Inc.*, 681 F. Supp 1117 (W.D.N.C. 1988); and *Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984).  There is therefore no basis to assert that the Department has not and does not utilize its authority to seek injunctive relief under section 12(a) of the Act when necessary to stop the movement of goods that were produced in a facility in or about which oppressive child labor was employed.

Finally, Defendant's argument (Doc. 6 at 11-14) that even if the Acting Secretary is authorized to seek injunctive relief, that relief is not necessary in this case, is likewise without merit.  As noted above, the FLSA contains two distinct child labor provisions. One provision, section 12(c), contains the prohibition on employment of oppressive child labor, which can be addressed through the imposition of civil money penalties, *see* 29 U.S.C. 216(e), and through injunctive relief, *see* 29 U.S.C. 217.  Congress also enacted a completely separate provision, section 12(a), to stop the shipment of goods in interstate commerce that were tainted by the employment of oppressive child labor.  Section 12(a) is an equally important tool in the Acting Secretary's child labor enforcement arsenal to section 12(c). *See Citicorp Indus. Credit Inc. v. Brock*, 483 U.S. 27, 26 n. 8 (1987) ("Exclusion from interstate commerce of goods produced under substandard conditions is not simply a means to enforce other statutory goals; it is itself a central purpose of the FLSA."); *id.* (citing 29 U.S.C. 202(a) and describing the harm to commerce when hot goods are permitted to enter the stream of commerce). This is *particularly* so in cases such as this one, where the employer has a history of child labor violations at its numerous poultry

processing plants *and* has continued to ship hot goods in violation of section 12(a).  As the Fifth Circuit observed in *Lenroot v. Kemp* and *Lenroot v. Hazlehurst Mercantile Co.*, 153 F.2d at 157, "Confronted with facts showing active violations, belief in a future course of law-observance, based merely upon the defendants' reputation of being law-abiding, is not enough. Lip service to a law, with a background of violations, does not guarantee future compliance."  *See also Lenroot v. Interstate Bakeries Corp.*, 146 F.2d at 328 ("The Act contains no suggestion that the mere declaration by corporate officers of a policy of obedience to the law . . . leave the court with no duty  of enforcement."); *Su v. L & Y Food*, 2024 WL 1632954, at *1 (identifying among the irreparable harms supporting the issuance of a TRO, that otherwise hot goods produced in violation of the Act's child labor provisions will enter the stream of commerce).  In this case, injunctive relief is necessary to ensure Defendant's future compliance with the child labor laws.

## <u>CONCLUSION</u>

Defendant's Response misconstrues the Acting Secretary's position and requests for relief in her Motion for a Temporary Restraining Order and Preliminary Injunction.  Defendant further misrepresents the law and fails to justify its attempts to evade responsibly for employing oppressive child labor – while simultaneously making it clear it has no intention of ceasing that activity. Accordingly, the Acting Secretary respectfully submits that this Court should ignore Defendants' arguments and grant the Acting Secretary's Motion for a Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

ADDRESS:                                   SEEMA NANDA
                                           Solicitor of Labor
Office of the Solicitor
U.S. Department of Labor                   TREMELLE I. HOWARD
61 Forsyth Street, S.W.                    Regional Solicitor
Room 7T10
Atlanta, GA 30303                          KRISTIN MURPHY
                                           Acting Counsel

                                           By: */s/ John O. Gainey*
Telephone:                                      JOHN O. GAINEY
(678) 237-0623                                  Trial Attorney
(404) 302-5438 (Facsimile)
Murphy.kristin.r@dol.gov
gainey.john.o@dol.gov                      Attorneys for the Acting Secretary
atl.fedcourt@dol.gov                       of Labor, United States
                                           Department of Labor

CERTIFICATE OF SERVICE

I certify that on May 14, 2024, the foregoing Plaintiff's Response to Defendant's Brief in Opposition to Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction was filed using the CM/ECF system and a copy was served via electronic mail on the following counsel of record:

> J. Larry Stine
> WIMBERLY, LAWSON, STECKEL,
> SCHNEIDER, & STINE, P.C.
> Lenox Towers, Suite 400
> 3400 Peachtree Road, N.E.
> Atlanta, GA 30326
> jls@wimlaw.com

> > */s/  John O. Gainey*
> > **JOHN O. GAINEY**
> > Trial Attorney
> > Office of the Solicitor
> > U.S. Department of Labor
> > *gainey.john.o@dol.gov*
> > Atlanta Docket
> > atl.fedcourt@dol.gov

SOL Case No. 24-00271

16