# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | |
|---|---|
| JULIE A. SU, Acting Secretary of Labor, United States Department of Labor, | ) ) ) ) |
| Plaintiff, | ) )   6:24-cv-00569-LSC ) |
| v. | ) ) ) |
| MAR-JAC POULTRY OF ALABAMA, LLC, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OF OPINION AND ORDER

On May 7, 2024, Plaintiff Julie A. Su, Acting Secretary for the Department of Labor, filed a Motion for a Temporary Restraining Order and Preliminary Injunction against Defendant Mar-Jac Poultry of Alabama, LLC. (Doc 2.) In the Motion, Plaintiff alleged that Defendant had violated the Fair Labor Standards Act ("FLSA") by employing oppressive child labor for the production of commercial goods. 29 U.S.C. §§ 212(c), 215(a)(4). Plaintiff discovered the alleged violations during the late-night shift of April 30 to May 1, 2024 when investigators from the Department of Labor's Wage and Hour Division executed a civil search warrant. (Doc. 18 at 14:11–16.) The investigators discovered four minors under the age of eighteen working in Defendant's poultry processing plant located at 3301 3rd Ave, Jasper, Alabama 35501 (the "Jasper Plant"), along with one individual who had turned

1

eighteen years old seven days prior to the search. (*Id.* at 16:21–17:1.) Later, while conducting interviews at a local high school, the investigators discovered an additional minor under the age of eighteen who worked at the Jasper Plant. (*Id.* at 74:24–75:24.) Altogether, Plaintiff presents six individuals who it alleges worked in prohibited positions within thirty days of the search. (Doc. 20 at 3–4.)

Plaintiff specifically sought Defendant to: be enjoined from employing oppressive child labor; produce employment records of all individuals employed since August 1, 2020; maintain accurate and complete employment records, and to take further steps in facilitating such accuracy; be enjoined from retaliating, intimidating, or discriminating against any current or former employees exercising their rights under the FLSA; be enjoined from shipping or delivering for shipment into commerce any poultry produced or processed at its Jasper Plant in or about which within thirty days prior to the removal of such goods any oppressive child labor had been employed (a so-called "hot goods" injunction); and disgorge all profits related to the shipment of or delivery for shipment of "hot goods" and provide records of such profits. (Doc. 2-6.) As the thirty-day period has passed, Plaintiff now primarily seeks Defendant to be enjoined from: any further use of child labor; shipping any goods that were produced in the thirty-day period, and for whatever reason were not shipped at that time, into interstate commerce; and disgorging all

2

profits from goods produced in the Jasper Plant for the thirty days following May 1, 2024. (Doc. 20 at 15.)

On May 14, 2024, the Court conducted an evidentiary hearing and heard oral argument from both parties on the Motion. The parties then requested an additional three weeks to provide further briefing. The parties then requested an additional two weeks to negotiate a settlement agreement. On June 24, 2024, the parties informed the Court that the settlement negotiations were unsuccessful. The Motion is now fully briefed and ripe for review. For the reasons explained below, Plaintiff's Motion is DENIED.[1]

Temporary restraining orders and preliminary injunctions are "extraordinary remed[ies]," for which courts "'should pay particular regard for the public consequences' of granting." *Sensible Loans Inc. v. Block Indus. Inc.*, 5:20-cv-1512-LCB, 2022 WL 17541011, at *2 (N.D. Ala. Dec. 8, 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). A party seeking a temporary restraining order or a preliminary injunction must establish: "(1) a substantial

---

[1] For the purpose of this Motion, the Court assumes, without deciding, that disgorgement is an available remedy. The Court recognizes that Defendant fervently contests the availability of disgorgement under this provision of the FLSA, but that is an issue for another day. Defendant is directed to maintain financial records from the relevant thirty-day period so that the Court will have the ability to order disgorgement at the conclusion of this case, if the Court finds it is due.
    The Court also recognizes that, under the FLSA, the Acting Secretary is given power to seek civil monetary penalties with limits up to $11,000 for each employee who was the subject of a violation. 29 U.S.C. § 216(e). Regardless, the Court reserves judgment on the question of what is the appropriate remedy, if the Court later finds one is merited.

likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) entry of relief would not be adverse to the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005); *see also Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995). "Controlling precedent is clear that injunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion." *Schiavo*, 403 F.3d at 1226.

Under § 212(c) of the FLSA, employers are prohibited from employing "oppressive child labor." 29 U.S.C. § 212(c). Under § 212(b) and § 217, the Secretary of Labor may bring an action "to enjoin any act or practice which is unlawful by reason of the existence of oppressive child labor." *Id.* § 212(b). Under § 203(l), the Secretary is empowered to declare what is "oppressive child labor." 29 C.F.R. § 570.61 "Occupations in the operation of power-driven meat-processing machines and occupations involving slaughtering, meat and poultry packing, processing, or rendering" ("HO10") sets forth what occupations in a poultry plant constitute oppressive child labor. Importantly here, "[a]ll occupations on the killing floor" and "[a]ll boning occupations" are prohibited for minors under the age of eighteen. 29 C.F.R. § 570.61(a)(1), (5).

The FLSA also contains a "hot goods" provision specifically for oppressive child labor, which provides: "No producer, manufacturer, or dealer shall ship or deliver for shipment in commerce any goods produced in an establishment situated in the United States in or about which within thirty days prior to the removal of such goods therefrom any oppressive child labor has been employed. . . ." 29 U.S.C. § 212(a). Courts have rarely had the occasion to apply this provision. But in discussing a related hot goods provision of the FLSA—one specific to the minimum wage, maximum hours, and employment under special certificates—the Supreme Court has stated that "exclusion from interstate commerce of goods produced under substandard conditions is . . . itself a central purpose of the FLSA." *Citicorp Indus. Credit, Inc. v. Brock*, 483 U.S. 27, 36 n.8 (1987).

After hearing the evidence and evaluating the parties' briefs, it is clear to the Court that the Plaintiff cannot establish a substantial likelihood of success because Plaintiff cannot establish that Mar-Jac acted with the requisite scienter. While Plaintiff argues that the FLSA imposes strict liability for child labor violations (Doc. 19 at 38:9–12), Plaintiff's argument is contrary to binding precedent.

In *Gulf King Shrimp Co. v. Wirtz*, the old Fifth Circuit affirmed the district court's issuance of an injunction, though not a hot goods injunction, that enjoined an employer from violating the child labor provisions of the FLSA. 407 F.2d 508,

517 (5th Cir. 1969).[2] In so holding, the old Fifth Circuit explained: "[A] corporation 'must be held strictly accountable for [its] child labor violations.' . . . We are told that 'The cases must be rare where prohibited work can be done within the plant, and knowledge or the consequences of knowledge avoided.' With these principles in mind *we need only inquire whether the circumstances of the present case were such that the employer either had knowledge that minors were illegally in his employ, or else had 'the opportunity through reasonable diligence to acquire knowledge.'*" *Id.* at 512 (emphasis added) (quoting *People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 121 N.E. 474, 476 (N.Y. 1918)). Because the district court found that Gulf King's management knew of a common practice that minors used to circumvent the child labor restrictions, that the Department of Labor had previously warned Gulf King of child laborers in its employ on two separate occasions, and that one minor was even formally on the company payroll, the old Fifth Circuit held that Gulf King had the opportunity through reasonable diligence to acquire knowledge of the employed minors. *Gulf King Shrimp Co.*, 407 F.2d at 513. The old Fifth Circuit *never* stated that the FLSA imposed strict liability.

Here, Plaintiff has presented no evidence that Defendant knowingly employed any person under eighteen years old. To the contrary, it is Defendant's corporate

---

[2] Fifth Circuit Opinions prior to October 1, 1981 are binding in the Eleventh Circuit and thus on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

6

policy to not hire anyone under the age of eighteen years old, and Defendant contends that it steadfastly adheres to that policy. (Doc. 18 at 127:18–23.) Defendant has presented evidence that all of the minors provided it with false documentation, which stated that the minors were over the age of eighteen. (Doc. 15-2; Doc. 18 at 40:15–17, 108:20–23, 128:23–129:13, 132:16–133:21; Doc. 21 at 3.)[3] Defendant then ran the documents through E-Verify, a system operated by the United States of America, which confirmed the validity of the documentation. (Doc. 18 at 41:9–19; 129:9–13, 132:25–133:21; Doc. 19 at 6:25–7:3; Doc. 21 at 3.) Rejecting this documentation after verification by the United States could possibly have exposed Defendant to liability for discrimination under the Immigration Reform and Control Act of 1987 (IRCA), 8 U.S.C. § 1324b(a)(6).

Additionally, Plaintiff has presented no evidence that Defendant had the opportunity through reasonable diligence to acquire knowledge of minors in its employ.[4] The Department of Labor has not specifically warned the Jasper Plant

---

[3] The abundance of false documentation in this case gives the Court pause, especially at this stage of the case, in even finding that the six workers were minor children. In establishing that Defendant employed five of the minors, Plaintiff presented a Guatemalan I.D. (Doc. 14-11), a Guatemalan birth certificate (Doc. 14-12), an Alabama immunization record (Doc. 14-16), and a Guatemalan birth certificate (Doc. 14-18), all of which were provided to Plaintiff by the respective minors. For the minor who was later identified during the school visit, Plaintiff apparently verified her age with school records. (Doc. 18 at 75:13–16.) While this documentation may seem legitimate, so did the documentation that the minors presented to Defendant. Who is to say that this documentation, which indicates the workers are minors, is not also fake?

[4] To the extent Plaintiff points to an employment record that suggests a different person filled out the minor's personal information section from the person who signed the document (Doc. 14-19),

7

about prior child-labor violations. (Doc. 19 at 29:17–31:4.) All other Department of Labor investigations into Mar-Jac, with the exception of one investigation into Mar-Jac's Mississippi facility, have pertained to alleged wage and hour violations. (*Id.*) To the extent that Plaintiff argues that Defendant knew, or had reason to know, that it was employing minors based on the workers' "appearance and mannerisms" (Doc. 18 at 54:12–15, 89:9–11, 91:25–92:1, 102:2–5; Doc. 20 at 11 & n.8), the Court disagrees. Perhaps if the minors were much younger children, appearance and mannerisms could signal minority. But there are many people who appear younger than their actual age, and Plaintiff's "appearance and mannerisms" test would unfairly affect those individuals' employment opportunities, essentially discriminating against those individuals on the basis of appearance. Accordingly, Plaintiff has not established that Defendant knew it was employing the minors or that Defendant was not reasonably diligent in acquiring this knowledge.

Further, it is also worth noting that Plaintiff has not established that five of the six minors were working in prohibited positions. Of the five minors that the Department of Labor investigators discovered working in the Jasper Plant during the execution of the search warrant, three were working in the "rehang" department. (Doc. 18 at 53:7–18, 73:19–74:7; 99:16–19.) While Plaintiff has characterized the

---

the Court still does not believe this shows a lack of reasonable diligence, particularly since all the minors supplied Defendant with documentation that passed E-verify.

first three minors as working on the killing floor, which is prohibited by HO10, that is not an accurate characterization of the first three minors' work. Under HO10, the "killing floor" is defined as "includ[ing] a workroom, workplace where such animals . . . are immobilized, shackled, or killed, and the carcasses are dressed *prior* to chilling." 29 C.F.R. § 570.61(b) (emphasis added). The Jasper Plant strictly delineates from a "live side," where chickens are slaughtered, and a "cold side," where the rehang department works. (Doc. 6 at 21.) Employees are not permitted to venture between the two sides. (*Id.*) The rehang department does not engage in killing or hanging live chickens; rather, the rehang department removes chilled carcasses out of the "chiller" and places the carcasses in shackles for further processing. (Doc. 18 at 38:4–10, 63:2–24, 116:25–117:12.) In a video Plaintiff presented during the evidentiary hearing to demonstrate the work of the rehang department, it was apparent to the Court that the chickens had gone through initial processing and were wet from the chiller by the time they reached the rehang department. (Plaintiff's Exhibit 11.)

To the extent Plaintiff argues that "chilling" under HO10 constitutes twenty-four to forty-eight hours of refrigeration and thus that the rehang department works on the killing floor even though the carcasses had gone through the chiller (Doc. 19 at 170:9–12), Plaintiff's interpretation of H010 is contrary to the plain text of the regulation. Chicken carcasses that have been chilled by a chiller have undergone

9

"chilling" for the purposes of H010. Therefore, the rehang department does not work on the killing floor, and the first three minors' work was not prohibited.

The fourth minor that the Department of Labor discovered during the execution of the search warrant was working as a "wing cutter." (Doc. 18 at 87:5–12.) While Plaintiff claims that the minor was working in a "boning occupation," the Court also disagrees with Plaintiff's characterization of that minor's position. HO10 defines a "boning occupation" as "the removal of bones from meat cuts. It does not include work that involves cutting, scraping, or trimming meat from cuts containing bones." *Id.* True, Defendant's records state that this minor's job profile was "Debone Cone Lines Night – Hourly." (Doc. 6-2 at 6.) But, as evidenced both by the testimony of Investigator Gonzalez and a video Plaintiff played, the fourth minor was using a standard knife to cut wings from carcasses as they passed along a conveyor. (Doc. 18 at 118:19–119:8; Plaintiff's Exhibit 20.) The fourth minor was "cutting . . . or trimming meat from cuts containing bones." *Id.* Accordingly, the regulations explicitly exempt the fourth minor's work.

As to the individual discovered during the execution of the search warrant who had turned eighteen seven days prior to the search, Plaintiff has also failed to establish that she worked in a "hazardous position." According to the testimony of Investigator Diaz-Lopez, this minor stated that that her job duties were to ensure that the chicken breasts were properly cut, essentially as an "inspector." (Doc. 18 at

103:14–25, 107:5–22.) Investigator Diaz-Lopez did not personally observe the fifth minor on her job site. (*Id.* at 107:12–14.) Plaintiff has not produced any evidence that the fifth minor was working on the killing floor. Therefore, as inspecting meat is not prohibited by HO10, Plaintiff had not met her burden in establishing that the fifth minor was working in a prohibited position.

The final minor (the "sixth minor") Plaintiff identified was discovered by Investigator Roman during interviews at the local high school—not during the execution of the search warrant. (Doc. 18 at 75:1–6.) The sixth minor told Investigator Roman that she worked in "deboning," where she checked chickens for bones and then removed the bones. (*Id.* at 75:21–24.) In Defendant's documents, the sixth minor's job was listed as "evisceration" (Doc. 14-6), though Investigator Roman did not testify that the sixth minor discussed evisceration with him (Doc. 18 at 79:14–18).[5] And, notably, the sixth minor did not claim to have ever used any machinery, like a deboning machine, while working at the Jasper Plant. (*Id.* at 80:8–13.) However, as a "boning occupation" is one involving "the removal of bones from meat cuts," Plaintiff has established that this minor, and only this minor, was working in a hazardous position. 29 C.F.R. § 570.61(b).

In addition to not establishing a substantial likelihood of success on the merits, Plaintiff has not established that the threatened injury to commerce outweighs the

---

[5] Evisceration occurs on the killing floor prior to chilling. (Doc. 18 at 114:15–17, 116:1–10.)

harm that would be inflicted on Defendant, or that granting relief would not be adverse to the public interest. While it is a policy of the FLSA "to eliminate the competitive advantage enjoyed by goods produced under substandard conditions," *Citicorp*, 483 U.S. at 36 (citing 29 U.S.C. § 202(a)), granting this injunction would inflict immense harm on Defendant and the public. If the Court had granted this injunction immediately after it was filed and thus prohibited the hot goods from entering interstate commerce, the Jasper Plant would have shut down for approximately thirty days.[6] Defendant is the largest employer in the county, employing over 1,000 workers. (Doc. 6 at 4.) By Defendant's estimate, a plant shutdown would have resulted in a payroll loss of approximately $3.5 million, not to mention economic losses to local farmers, breeders, hatcheries, feed mills, and other similarly situated individuals. (Doc. 6-1 ¶ 12.) In total, the evidence presented demonstrated that the requested 30-day hot goods injunction would have resulted in $63 million in economic damages. (*Id.*) In addition to the economic damages to Mar-Jac and to the local community, millions of pounds of chicken carcasses would have been placed in landfills. The amount of economic and physical waste would simply have been astronomical. Not to mention, as Mar-Jac is one of the largest chicken

---

[6] While during the hearing Plaintiff clarified that it would have no objection to Mar-Jac shipping hot goods to in-state buyers, a large company like Mar-Jac often has a substantial number of out-of-state customers.

distributors in the Southeast, there would have been a shortage of chicken on the market, leading to a drastic price increase in an already inflation-ridden economy.

Now that the thirty-day period has passed, the disgorgement remedy that Plaintiff seeks, along with the prevention of any stored meat from the thirty-day period from entering interstate commerce, would still inflict unjustifiable harm. Mar-Jac's net profit from the Jasper Plant averages around $2 million per month. (Doc. 20-2.) Taking this profit without a full and fair hearing following discovery would violate due process, particularly when Plaintiff has failed to meet its burden for either a temporary restraining order or preliminary injunction. Therefore, this potential remedy will be considered at the ultimate trial or dispositive stage of this matter.

Notably, Plaintiff has cited only one case where it appears that a binding court discussed the propriety of a child-labor hot goods injunction—*Lenroot v. Kemp*, 153 F.2d 153, 154 n.1, 157 (5th Cir. 1946). However, in *Kemp*, the old Fifth Circuit only reversed the trial court's refusal to enter the injunction after finding the "repeated, persistent, and deliberate violations" by the defendant employers did not outweigh their otherwise sterling reputations in the community. *Id.* at 157. Unlike in *Kemp*, where the defendant employers were warned multiple times about their child-labor violations, here, the Department of Labor investigators discovered six minor employees on one occasion, out of more than a thousand workers, who were all

promptly terminated. (Doc. 19 at 29:17–31:4.) Thus, the equities do not weigh in favor of the extreme remedy that Plaintiff originally sought or currently seeks.

Lastly, the Court agrees that Plaintiff has established the irreparable injury requirement. Even if the Acting Secretary was not entitled to a presumption of irreparable injury,[7] several courts have persuasively recognized that entrance of hot goods into the stream of commerce constitutes irreparable injury because "hot goods unfairly compete with goods produced in conformity with the FLSA," *Chao v. Ladies Apparel Grp., Ltd.*, No. 01 CIV. 10724, 2002 WL 1217194, at *4 (S.D.N.Y. June 5, 2002), and "perpetuat[e] . . . [substandard] labor conditions among the workers of the several states," *Id.* (quoting 29 U.S.C. § 202(a)(1)). *See also Chao v. Blocker Farming Enter., LLC*, 606CV051, 2006 WL 8435752, at *2 (S.D. Ga. May 16, 2006); *Brock v. Rusco Indus., Inc.*, No. CV686-025, 1986 WL 32748, at *1 (S.D. Ga. Mar. 20, 1986); *Ford v. Ely Grp., Inc.*, 621 F. Supp. 22, 26–27 (W.D. Tenn. 1985)), aff'd. sub nom., *Brock v. Ely Grp., Inc.*, 788 F.2d 1200 (6th Cir. 1986), aff'd. sub nom., *Citicorp Indus. Credit, Inc. v. Brock*, 483 U.S. 27 (1987).

However, even though Plaintiff has shown irreparable injury, Plaintiff has not established likelihood of success on the merits, that the threatened injury outweighs

---

[7] "[W]hen 'an injunction is authorized by statute and the statutory conditions are satisfied the usual prerequisite of irreparable injury need not be established.'" *CSX Transportation, Inc. v. Alabama Dep't of Revenue*, 888 F.3d 1163, 1181 n.8 (11th Cir.), opinion modified on denial of reh'g, 891 F.3d 927 (11th Cir. 2018) (quoting *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984)).

the damage to Defendant, or that granting injunctive relief is in the public interest. To be clear, the Court abhors child labor—the thought of employers recruiting or employing young children to work with dangerous machinery is chilling. But Plaintiff has not shown that is what happened here. Plaintiff's request for a temporary restraining order and preliminary injunction is DENIED.

**DONE** and **ORDERED** on July 2, 2024.

_____
L. Scott Coogler
United States District Judge

215755